Judge Loken, may it please the court. This case is an obvious one concerning exculpatory evidence that would negate probable cause for arrest and search warrants following an investigation by Detective Bowles that was not reasonably thorough even though he had the luxury of time, unhurried judgment, and repeated reflection. All agree that a St. Louis fire captain and his lady companion were shot in a parked car in the Soulard neighborhood just south of here on Super Bowl Sunday in 2017. But there's no probable cause that the Hartman brothers had anything to do with the shooting if Detective Bowles had the expected characteristics of the actual shooter from the Hartman brothers. Now you're talking about the arrest warrant. And the search warrant, yes. But you can have a search warrant for mere evidence. Yes, Your Honor, but there still needs to be a link between... They were linked to the scene. They were linked to the scene, but I would suggest that under this court's opinion in Bell as well as in other jurisdictions, the lack of vicinity in an urban area on Super Bowl Sunday when bars and restaurants are crowded is a generic characteristics and lacks the particularization necessary for probable cause. Because after all, the test is not merely whether the incriminating evidence is sufficient, but also whether plainly exculpatory evidence affects the totality of the case. I obviously didn't agree with the majority in Bell, but I've always viewed that case to the extent I can figure out what the majority was doing. I've always viewed that case as dealing with basically two essential facts. One is the kid was not sweating that they picked up. And the second was sort of what I think Judge Colleton brought up in his concurrence, which is the incredible explanation that he changed his socks at some point during the seven minutes. Now, of course, I didn't find that persuasive, but my point here is we don't have anything like that in this case. Well, a couple of points on that, Judge Strauss, because of course I've read your partial dissent on the immunity issue with some care, I hope. First of all, in Bell, the officers either had personal knowledge of the suspect or relied on fellow officers. That's not present here. In fact, the obverse is true, or converse, in the sense that Detective Bowles did not interview any of the officers who responded to the scene. Second of all, in Bell, the officers reviewed the video, and there was some discussion, majority opinion, of the care with which they reviewed that video. I would suggest here Detective Bowles' review was insufficient, because we know that when he actually the plate was different was sufficiently exculpatory for the charges to dismiss. Now, that brings up a fact question I was going to ask. You argue in the briefs, at least I read the briefs, as arguing that it's clear, or alleging, that the defendant listened to the 911 tapes. He did not before he filed the probable cause statements. He did later on, but right now what is before the court is just counts one to the initial search and arrest. Good, because that's what the district court said he didn't. And I apologize if the briefing wasn't sufficiently clear. All right. So in your view, this is in some ways more obvious than Bell, because it's definitely different than Bell. I don't think you can say that it's on all fours with Bell, but I think you might be able to say, because there was video evidence there, and I actually watched the video. I couldn't tell in Bell, but that's a different issue. That in some ways it's more obvious than Bell, and in some ways it's less obvious than Bell. I mean, you would agree there's some ways to distinguish it. I would agree with that, Your Honor. I mean, the bright line issue here, the gravamen of the appeals, we framed it, is race. Essentially that there's three excited utterances. One from the fire captain himself on the 911 call, then to officers Paul and Ryan at the scene. We know when we even have a call of evidence, 803, that that gives a heightened weight to excited utterances. And again, that evening, Officer Summers at the hospital, again, black male hoodie. It was not until later on the next day when Detective Bowles interviewed the captain that the captain appeared to have some doubt on that identification or some lack of recollection. But even Detective Bowles said those statements were tainted because the fire captain was sedated on medication, and therefore their value under the totality of the circumstances was quite low. Related to what Judge Loken was asking is, I know you allege this in the complaint, we're on a motion to dismiss, but what is the basis for alleging that Detective Bowles knew about the statements from the witnesses for which he was not present? I don't believe the complaint pleads that he did know. That gets to the second part of this appeal, which is essentially that Detective Bowles' investigation was reckless. Whether or not, what he knew exactly at the time he filed the statements is unclear to us. We don't think that he had interviewed those officers, but that just begs the question of what is a reasonably thorough investigation. And there's five points on that. I'm wondering, you know, you're saying that there's a Franks problem, and I'm just, and I know you're going to the second point, I'm just trying to figure out, did he know that the victims were describing the suspect as black with a hoodie on? Or perhaps did he not know? Well, I believe that he did not know of those statements at the time, but I also believe for the immunity analysis, the question is an objectively reasonable belief. So his subjective lack of knowledge, to the extent that it was based on a reckless failure to do a thorough investigation, does not save him. But here's the problem. You're relying on the obviousness exception, and I think the argument is a lot stronger and a lot more reasonable, if he had some knowledge that the witnesses had described the assailant as black and with a hoodie. Well, Your Honor, looking at the immunity cases from this court, we know that in Winslow v. Smith, for example, the issue, as I read the opinion, is that the officers had multiple opportunities to see the evidence that did not support their theory of the case, including the plaintiff's blood type. The focus is on the multiple opportunities to see the evidence, not the presence or absence of knowledge per se. Similarly in Kewel, we have further investigation being warranted. Similarly in the Williams v. City of Alexander case, there was no immunity because if the plaintiff had added back in exculpatory facts that the policeman who had cashed the check, in fact, got the okay from the city, he paid it back within 48 hours. How many of these cases are warranted affidavit cases? Bell certainly is not. No, it's not, Your Honor, and as you know... In the case of Winslow, I mean, I haven't gone and read all the cases and cited, but my impression is most, if not all, of them are not warranted affidavit cases. I can tell you, Your Honor, that some of the cases are warranted affidavit cases. So what's your best warranted affidavit case? I would say small v. McChrystal and Williams v. City of Alexander. Those are both arrest warrant cases where the officers omitted exculpatory facts. This court found under both prongs of Pearson v. Callahan that, number one, there was no probable cause, and number two, that there was no qualified immunity because the right was clearly established at the correct level of particularity. Similarly, in the J.C. Penney case, which is the Tenth Circuit, but was relied on by the Bell panel, and I believe as well the Kuehl panel, that there was no probable cause for shoplifting when there was exculpatory, extrinsic evidence in the form of a video, like in Bell, like here, and receipts. One other point I'd like to raise is that both the District Court and Detective Bowles cite to the not entirely unreasonable standard. And that's a standard that was articulated by the Supreme Court in Messerschmitt, and also in the progeny in this circuit, in this court, in Kiesling. That's the Deer case, where there's a divided panel, the majority is written by Judge Grunder. But those cases concern search warrants, and they get to breathing room. So in other words, there's a dissent, in fact, in Kiesling about breadth, overly broad. They said the search for the deer, that's fine, there was probable cause for that, but the search for all sorts of other sort of somewhat related instrumentalities of the crime was not within the reasonableness on a search warrant. But we're not dealing here with breadth of a search warrant. That's not the government of our appeal. Our line of cases is much more rooted in Kuehl and Bell, because the material facts that are exculpatory would negate the probable cause analysis. Which he could have only gotten through a reasonable investigation. That's the main thrust here. That is the main thrust, Your Honor. And just to, I remember in your dissent, as I recall, you have video review that you thought was sufficient, even if it could have been a little closer. Plus, there was a witness who appeared, perhaps mistakenly, but perhaps reasonably so in your view, to implicate Mr. Bell, and then there was the reliance on fellow officers or personal knowledge. In other words, here, there's no particularization. And I think the distinctions are meaningful, and Detective Bowles argues, well, I relied on the race issue only because the fire captain made an impermissible racial stereotypes about hoodies and baggy clothes. But that just begs the question of the lack of particularity for his view. Certainly, there are precedents from this court that say merely being in the vicinity without more particularization is insufficient to probable cause. Perhaps if we were in remote woodland somewhere and there was no one around, mere presence could be more inculpatory, not so in an urban area on Super Bowl Sunday. And to your point about the investigation, Judge Strauss, he didn't listen to the 9-1-1 tapes. He did not talk with the officers who responded to the scene. He did not include that both the 9-1-1 caller, Mr. Perry, and Officer Shelton identified the shooter's car as a blue Chrysler 200, where the Hartmans drove a gray Infinity. He did not include the fact that the fire captain did not identify the Hartmans in a photo lineup. That itself was defective because the Hartmans were the only two people in the photo lineup. Let me ask you, though, about the race issue, and I want to go back to the interview he had with the fire captain. Do you think it was specific enough? Because he gets at stereotypes. The fire captain gets at stereotypes. Was it specific enough, do you think, to alert the detective that the assailant was actually black? Or do you think it's too ambiguous based on the fact that, A, he was sedated, and B, he was relying on stereotypes? I think it was baggy pants or something like that. Yes. I believe that in itself alone, it is a low-value statement. That's why Detective Bowles himself said the interview was tainted. And therefore, its weight under a totality of the circumstances analysis is very low. It should have indicated to Detective Bowles that a more thorough investigation was reasonable and warranted. And if he had listened to those tapes, if he had interviewed the officers at the scene, if he had given the appropriate due weight to those excited utterances, black male hoodie, that would have been a clearly exculpatory fact for the Hartman brothers. And we're dealing, after all, with real damages here. The brothers served five months in the city jail and then 20, 21 months of house arrest. So this was not a mistake that had a merely incidental effect. Some of the QI cases have very momentary seizures at the side of the road. Or in the Andrews versus Fuos case, a mother who was temporarily seized in the courtroom at her son's sentencing. Those types of de minimis injuries are distinguishable from the real seizures here, had there been a thorough investigation. I see I have a minute left. If there's no other questions at this point, I'll reserve the rest of my time. I was going to ask whether you agree that Carnahan is the standard for material warrant affidavit omissions. But you're not really relying on the materiality of what he knew being omitted. Correct, Your Honor. This is an omissions case. So we- But you have perhaps the highest hurdleness. Not only the relative infrequency of material omission decisions, but in my experience, the almost total absence of warrants being bad for the reasons you say. There was nothing material omitted that he knew, but he should have known more. Well, that begs the question of whether or not there was a thorough investigation to come to that. No, but that's what I mean, should have known more. Right. He couldn't go seek a warrant until he'd spent another day or two. Well, I think here you have facts that rise to the level of recklessness and not mere negligence, Your Honor. Because the inculpatory facts- Was that argued to the district court? Was that distinction? It did not appear to be an issue that was the basis for Detective Bull's 12B6 motion. I didn't see a lot of record in that in the district courts. So we're talking about- Perhaps I'm misapprehending your question, Your Honor. Well, you resisted. You just said, well, it wasn't raised by them in the 12B6 motion. Well, no, it's your opposition to the 12B6 motion. It was you had to raise it. We did not get into the recklessness versus negligence. Well, how can we then? Well, because we did argue, however, that there was a lack of a reasonably thorough investigation. So I believe we sufficiently preserved that argument in the district court. Well, not the recklessness distinction. I'm not seeing a recklessness distinction in the case law that we're talking about. Well, when it comes to omissions, Your Honor, I read the case law to discuss either intentional or reckless omissions. I believe that argument was raised- What Supreme Court case are we talking about then? I'm looking at the Eighth Circuit, at least, Winslow v. Smith. That's a 2012 case that says the right was clearly established as of 1989. So clearly long before the events here. Okay. Thank you, Your Honor. Thank you. May it please the Court. Good morning, Your Honor. Mr. Wheaton. Thank you very much. I must begin by saying I'm completely taken aback by this assertion regarding an alleged reckless investigation in this case, which was never raised before the district court, never briefed as far as I'm concerned here on appeal. And it seems to me to be a shifting from the primary theory asserted by the plaintiffs and the Hartmans in this case was not identified as an issue on appeal in this case. And again, seems to be a shifting from the only issue on appeal here and is therefore waived. And since it wasn't substantially addressed by the Hartmans and thus neither by the appellee here, I can only remark on the reckless investigation claim that my familiarity with such claims is that they arise from the non-textual notion of substantive due process. And that in light of the Supreme Court's decision in 2017 in Manuel versus the City of Joliet, all pre- and post-trial deprivations of liberty must be assessed under the Fourth Amendment's reasonableness standard. Now, I thought, yeah, I'm having trouble with the case too, but I had thought maybe you can share if that's your understanding that really what I thought this case was about was that he knew or that the jury could infer the detective knew that there were these witness statements that said that the assailant was black with a hoodie. And that he just omitted those intentionally. Was that sort of your understanding as well? It was, Your Honor. And so I was likewise surprised by the concession here, or at least the statement that Detective Bowles had no knowledge of these statements. I understood that the complaint alleged he had not listened to the 911 calls until much later in the criminal case, and certainly not at the time of the warrant applications. But, yes, to answer your question, that's consistent with my understanding that this case was about whether, well, really a single dispositive question, which is, which arises from, of course, the Supreme Court's decision in Franks versus Delaware in 1978. Did he know something material that he didn't put in the affidavit or the statement? Right, and yes, Your Honor. And then on top of that, the question is, would it have been impossible for a neutral magistrate to make a finding of probable cause had the omitted information been included in the probable cause statements? That's the dispositive question in this case as far as Detective Bowles is concerned. That's the second step in an omission analysis under Kernan. Yes, Your Honor. It's likewise dispositive here, where even if Detective Bowles had known of this so-called excited utterance at the scene, he also knew that the next day he went and interviewed the victim fire captain in this case, who told him, and it's not disputed that he told him, the only reason that I believed that the shooter was black is, quote, only because he had on baggy pants, which is the sort of clothing worn by black people, and because of his body type, end quote. Of course, those are completely, that's completely an assumption based solely on a racial stereotype. You know, though, that might be the bridge too far for me in the sense that if he knew, and I'm going right past step one here, if he actually knew, if you have three statements, if you knew about one of them, but if he had three statements and knew all three statements that the victim had identified the shooter as black and with a hoodie on, and even if the fire captain said the next day with a baggy pants statement, if I'm a magistrate trying to decide whether or not there's probable cause, I'd kind of want to know that when you're trying to arrest two white guys. And so I wonder if that's not your strongest argument. Well, Your Honor, in light of the Stockley versus Joyce standards, which would it have been possible at all for a neutral magistrate to have found probable cause had they known that information? The answer to that question is absolutely yes, it would have been possible. Yes, I understand that as a magistrate, if you would like to know that information. Yeah, I don't know that I would have issued the warrant, to be quite honest with you. And I would say, I would probably tell the officer, go back and get me more and solidify this because I'm a little uncomfortable when the description says black and you're having me issue an arrest warrant for two white guys. The distinction there, though, is maybe a neutral magistrate wouldn't have. But the question is whether it's possible or not, which is an incredibly lenient standard for Detective Bowles in this case. Would it have been possible for a neutral magistrate to still find probable cause? Absolutely, because a neutral magistrate could have thought, well, that's just a racial stereotype and it says nothing of race. People of all different races wear baggy clothing, of course. No one can dispute that. The appellee doesn't dispute that. And people of all different races have all different kinds of body types. It is absolutely not probative of race at all. And then, of course, you have the fire captain's testimony under oath in this case that he does not recall the race of the shooter and that this was later in the criminal case in his deposition. He affirmatively said, I don't recall the race of the shooter. And by the way, I told Detective Bowles the day afterwards that I didn't recall the race of the shooter. I agree with you on the baggy pants. I'm more getting at the if he knew that there were several statements by the victim saying, no, it was a black guy. I think that that is a little more powerful. And on the several statements. That wasn't the next day, right? No, no. That was the previous day. It seemed to me the only way the plaintiff could prevail here is if there was an obligation to disclose the 911 statements the prior day and no obligation to disclose what he said the next day. That's exactly right. Because the two of them put together cancel out, so to speak, in probable cause terms. Yes, your honor. That's consistent with our understanding as well. And I'll just say on the probable cause point, I want to make one note about this multiple statements assertion. Pursuant to the well-pled facts in the complaint, the fire captain did say immediately after he was shot during the 911 call, black male hoodie. The second two purported excited utterances are those that the Hartmans asked this court to infer from other circumstantial evidence, being that that description was broadcast over radio transmission shortly after the shooting. So there's no actual affirmative evidence that the fire captain said it multiple times. I just want to make that clear. The only affirmative direct evidence of him saying black male hoodie was on the 911 call right after he had been shot. So I just want to make that distinction and clarification for the court. Yeah. And of course, we're now talking about a different situation, I think, based on counsel's argument, which is that he should have gone back after he had the either before or after he had the conversation in the hospital room and researched it. I think that's a different assertion than saying he knew about the earlier statement. Absolutely. And an assertion that I think is waived, given that it was not addressed at the district court or really substantively on appeal here, except in oral argument. So it's a completely different assertion. And so I can only fall back on, well, even if he did know, a neutral magistrate could still have found probable cause. And that's absolutely the case. And on the qualified immunity assessment, of course, there was some discussion of Messerschmidt and Kiesling. I just want to explain, to the extent it's not clear from the briefing, the defendant's position there, that in light, again, of the Supreme Court's seminal decision in the city of Joliet in 2017, that now all pre-trial deprivations and post-arrest deprivations of liberty are assessed under the Fourth Amendment. And so, Sect. Bowles submits that under the qualified immunity analysis here, of course, he already has the would-it-have-been-impossible standard, which is beneficial to him. But on top of that, under the qualified immunity analysis, he's entitled to qualified immunity unless it was entirely unreasonable for him to believe that it would have been possible for a neutral magistrate to find probable cause had he included the omitted information, which is an even more lenient standard here, so detect the Bowles asserts. And he's therefore entitled to qualified immunity. And I won't, the Court is undoubtedly familiar with general qualified immunity principles, and I won't waste your time with reiterating them. I'm sure you've applied them more times than I can count. But Detective Bowles could not have been on notice. Am I right? The district court didn't reach qualified immunity? Or did it do it, did it say it's an alternative? In the alternative, as I recall, but the district court did reach it in the alternative. You'd find that Detective Bowles is entitled to qualified immunity here. Make a big difference in whether we remand or not. Well, I'm sorry, Your Honor? If the district court didn't reach qualified immunity, we would likely remand. I believe that the district court did, and I'm relatively certain of that. Okay. There was in the order on the motion to dismiss an assessment of this entirely unreasonable standard, which necessarily to me means that the district court did reach the qualified question and found that Detective Bowles was entitled to qualified immunity in this case. And of course, the district court affirmatively found that there was probable cause to believe that the Hartman shot the fire captain and his companion. You know, I want to just briefly address the facts underlying that belief, giving counsel's assertion that it's based solely on the fact that they were in the area, and that's not the case. There was a multitude of evidence establishing probable cause here, including that, by the way, reflect a thorough investigation by Detective Bowles and refute this reckless investigation claim that's been made here. That evidence includes that the Hartmans left a gas station .4 miles away or six blocks from the scene of the shooting minutes before it occurred. The surveillance video from four different sources collected by Bowles during his investigation showed that the Hartmans left the gas station, passed the victim's vehicle on their right, just after they could have recognized it and targeted it, took the next immediate right into a series of Soulard side streets, and appeared to circle the block and approach the fire captain and his victim from behind, where a different surveillance camera that Detective Bowles pulled shows a dark-colored sedan turn off its headlights and a passenger get out of the passenger side of the vehicle, approach the fire captain. At that approximate time, multiple citizens called 9-1-1 and reported shots fired. The sedan in that surveillance video was a dark-colored sedan, like the ones that the plaintiffs were driving. A citizen named Antonio Perry reported on the 9-1-1 call for shots fired that he observed a dark-colored sedan engaged in suspicious activity. Later, he told Detective Bowles, when Bowles went and interviewed him, as part of his investigation again, and Perry told Bowles that could have been an Infiniti like the ones that the Hartmans were driving that night, which only further supports the probable cause determination here. On top of that, Bowles went and pulled GPS data from the cell phones of the Hartmans, showing they were in the area, went to the gas station and got records from credit card transactions there that the Hartmans were in that Infiniti, which appeared to circle the block and approach the victims from behind. So this is much more than just we were in the area. Now we're in the Bell arena, and actually, having seen the video, and you don't have the benefit, having seen the video on Bell, it wasn't very clear. I mean, you could kind of make out a stripe. And I think the same thing is exactly true here, which is they couldn't figure it out by looking at the screen. They could only figure it out by blowing it up and then figuring out that it wasn't an Infiniti. It was actually a Chrysler. And so I wonder now if you're walking right into Bell territory, unfortunately. Well, even if that's the case, Your Honor, Bell is, in my view, completely distinguishable from the facts at issue here. I mean, Bell, you had clear dash cam video depicting specific characteristics of the suspect, at least so the majority thought. Right. And this is those, according to the majority, those characteristics were so specific that they included the color of the tongue on the suspect's shoes. There's no clear video evidence of the shooter in this case. The only video evidence is from that camera I just discussed, where the characteristics of the person cannot be determined because it's dark and the video quality is poor. So all you can really see is a person getting out of the passenger side. So Bell, completely distinguishable, and the District Court appropriately distinguished it in multiple ways in its order. There's no clear video, no footage. I mean, there's no analogous circumstance to the Bell situation, where you've got a suspect calmly walking by who's not sweating a mile away and seven minutes after a different suspect fled. The distinction to me that's most powerful is the lack of any clear video depicting the actual specific characteristics of the so-called true shooter in this case. There's no such evidence here. And by the way, Bell was decided three and a half years after the arrested issue in this case and could not have put Bowles on notice anyway that he violated clearly established law. So Bell, in my view, is a completely different situation, particularly where the officers viewed the dash cam video eight times the day of the arrest and still didn't recognize this isn't our guy because he's wearing different clothing and we'd have to believe he changed his socks. At the same time, he ran a seven-minute mile and didn't break a sweat. I mean, it's completely distinguishable. One note on the hoodie aspect before I stop here, there was some argument made about the fact that he had said the guy was wearing a hoodie. And I'll just say that on the gas station video, the person in the passenger side of the vehicle could never be seen and the plaintiffs concede that in their brief and thus could have been wearing a hoodie just like the victims described in their so-called excited utterance. And I'll save 20 seconds for... Never mind, Your Honor. I don't get a rebuttal in this one. I get a rebuttal in the next one. So with that, I'll just say that Bell is completely distinguishable. Bowles is entitled to qualified immunity and it would not have been impossible for a neutral magistrate to find probable cause even if Bowles had included this racial stereotype statement that said nothing of the shooter's race. And if there are any questions, I'm happy to answer them. Otherwise, I'll seize my time. Thank you. Thank you, Your Honor. I guess your time was used. I'll give you a minute for rebuttal. Thank you, Your Honor. Just a couple of housekeeping notes. I believe here that the district court decided counts one and two on the first prong under Pearson that there was probable cause and not on the second prong of clearly established. On this preservation issue, Judge Loken, the district court discussed intentionality versus recklessness on page 19 of its original opinion on the motion to dismiss in June of 2020. That we, in our opening brief, do discuss at 38 a reasonably thorough investigation. Bowles, in his footnote 7, states that the omission must be intentional. We respond in our reply brief at 13. It can be intentional or reckless. Finally, on the sort of the sweating in the socks, as you say in Bell here, the James or Corey as he goes by is calmly buying cigarettes 140 seconds before the shooting. He's not wearing a hoodie. We know later that evening they went to a nightclub where hoodies were not allowed. There is something there as well. Thank you. Thank you, counsel. Case has been thoroughly briefed and well argued and we will take it under advisement.